UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAI DAVID ORTIZ,

                                   Petitioner,

                    -against-

WARREN D. BARKLEY, Superintendent, Cape
Vincent Correctional Facility,

                                   Respondent.

---

05 Civ. 5897 (RJH)

**MEMORANDUM OPINION
AND ORDER**

*Pro se* petitioner Jai David Ortiz seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state court conviction for robbing a husband and wife at gunpoint in August of 1999.  After a trial by jury, petitioner was convicted of two counts of Robbery in the First Degree, two counts of Robbery in the Second Degree, one count of Criminal Possession of a Weapon in the Second Degree, and one count of Criminal Possession of a Weapon in the Third Degree.  On February 13, 2001 petitioner was sentenced, as a second felony offender, to ten-year terms for each of the robbery counts and the second-degree weapon count, and a seven-year term for the third-degree weapons count, all to run concurrently.

On August 18, 2006, Magistrate Judge Douglas F. Eaton issued a Report and Recommendation ("Report") recommending that Ortiz's petition be denied.  Petitioner filed timely objections to the Report.  For the reasons that follow, this Court adopts the Report and denies the petition.

## BACKGROUND

The background and relevant procedural history are set forth in Judge Eaton's Report, familiarity with which is assumed. The facts relevant to this Opinion are briefly highlighted below.

Henry and Yin Trinh operated a fruit stand outside a storefront in lower Manhattan. On August 8, 1999, just after 9:00 p.m., two men robbed the Trinhs at gunpoint in a parking lot near their stand. The men fled with $ 8,000 in cash and a diamond ring. The Trinhs were unharmed, though a single, perhaps inadvertent, gunshot was fired. After the men left, the Trinhs called 911. They described the gunman to the police as a tall, thin Hispanic man. The responding officer interpreted the Trinhs' statements as indicating that the gunman was a 5'10" Hispanic man, twenty-five years old, weighing approximately 185 pounds. (Tr. II at 180:15–23.)[1]

While working at the fruit stand a few days after the robbery, Mrs. Trinh saw petitioner in a nearby store and recognized him as the gunman, but she did not contact the police. On August 25—seventeen days after the robbery—Mrs. Trinh saw the gunman again; this time he was in handcuffs and being led out of a hotel a few doors down from her store. Mr. Trinh did not want her to call the police, but she did so anyway the following day. On August 26, she was brought to the precinct for a photo array at which Mrs. Trinh identified petitioner (out of six total photos) as "the person that robbed me." (Tr. I at 73–75.) On September 1, 1999, the police prepared a lineup and both Mr. and Mrs. Trinh individually identified petitioner as the gunman from the robbery.

---

[1] The Trial Transcript consists of two volumes, referred to as "Tr. I" and "Tr. II." Volume I contains proceedings from the first trial of petitioner, which ended in a mistrial, as well as proceedings before Justice Tejada—who presided over the second trial—including testimony from the first four witnesses. Volume II begins on the second day of Mrs. Trinh's testimony. It includes the rest of the trial, as well as the sentencing.

Petitioner's first trial ended in a mistrial due to juror disagreement. At the second trial, the defense relied on a theory of mistaken identification. Henry Trinh and Yin Trinh were the prosecution's main witnesses. Donna Klett, a Legal Aid attorney and the only defense witness, testified that Mrs. Trinh, when interviewed before trial, said that she had seen the gunman in the neighborhood a number of times before the robbery. At trial, Mrs. Trinh denied making this statement to Ms. Klett. Petitioner's trial counsel argued on summation that though the Trinhs were sincere, they were biased and mistaken. He described the parking lot's lighting as inadequate for a reliable identification, and characterized the Trinh's descriptions of the gunman as incomplete and inconsistent. The jury found petitioner guilty on all counts.

On appeal and with different counsel, petitioner challenged the sufficiency of the evidence and the jury instruction on identification. The Appellate Division unanimously affirmed the conviction. Petitioner also filed two pro se 440 motions. In the first he claimed ineffective assistance of his trial counsel. The trial court denied the motion on November 13, 2003, finding Mr. Ives' representation "meaningful and not constitutionally defective." Permission to appeal the denial of this first motion was denied. On May 17, 2005 petitioner filed a second pro se 440 motion, claiming that the prosecutor had failed to provide *Rosario* and/or *Brady* material. The trial court denied this motion without an opinion, and the Appellate Division denied permission to appeal from that ruling.

On June 15, 2005, petitioner timely filed a petition for habeas corpus under 28 U.S.C. § 2254 ("Petition"), claiming:

   (1) ineffective assistance of counsel;

(2) deprivation of his due process right to a fair trial, and "Appellate Court [making] unreasonable determination of fact";

(3) that his conviction was against the weight of the evidence; and

(4) denial of due process "by the prosecutor's failure to disclose evidence favorable to the petitioner."

(Pet. 5–6.) Petitioner explained each of the grounds in varying degrees of detail. Under ground one, he pointed to his trial counsel's failure to call certain witnesses, attack the credibility of others, and bring particular facts to light. He also attacked the adequacy of the judge's instruction on identification testimony and his counsel's failure to remedy it. (*Id*. at 5A–5C.) Under ground two, he questioned the reliability of the identification testimony and noted that the Appellate Division appeared to believe that Mrs. Trinh had seen petitioner before the robbery. *People v. Torres*, 8 A.D. 123, 123, 779 N.Y.S.2d 34, 35 (N.Y. App. Div. 2004). As to ground three, petitioner disputed various findings of fact and offered alternative interpretations and explanations. (*Id*. at 6A–6G.) In describing ground four, petitioner mentioned only an alleged disparity between the tape of the Trinhs' 911 call, which was played for the jury and entered into evidence, and the tape's transcript, which was also given to the jury as an aid. (*Id*. at 6.)

Judge Eaton issued a Report concluding that: (1) any errors by petitioner's trial counsel did not constitute ineffective assistance of counsel; (2) petitioner's claims about the impropriety of the jury instructions involved unreviewable questions of state law and that the Appellate Division's apparent conclusion that Mrs. Trinh had seen the petitioner before the robbery did not foreclose a reasonable jury from deciding that the Trinhs had correctly identified petitioner; (3) the evidence presented against petitioner at trial was

sufficient to support a guilty verdict; and (4) the 911 tape had been entered into evidence and the trial court had properly instructed the jury not to consider the allegedly mistaken transcript of the 911 tape as evidence.

## DISCUSSION

### I.  Standard of Review

#### A.  AEDPA

Under 28 U.S.C. § 2254, when a claim has been adjudicated on the merits in state court proceedings, habeas relief may not be granted unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  The court must presume that factual findings made by a state court are correct unless petitioner rebuts this presumption by "clear and convincing evidence." 28 U.S.C. §§ 2254(d)(1), (d)(2), (e)(1);  *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

#### B.  Review of Magistrate Judge's Report

A district court may designate a magistrate to hear and determine certain motions and to submit to the court proposed findings of fact and a recommendation as to the disposition of the motion.  *See* 28 U.S.C. § 636(b)(1).  Upon review of the those portions of the record to which objections were made, the district court judge may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate

judge." 28 U.S.C. § 636(b)(1)(C). Reviewing courts should review a report and recommendation for clear error where objections are "merely perfunctory responses," argued in an attempt to "engage the district court in a rehashing of the same arguments set forth in the original petition." *Vega v. Artuz*, No. 97 Civ. 3775 (LTS), 2002 U.S. Dist. LEXIS 18270, 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002); *Greene v. WCI Holdings Corp.*, 956 F. Supp. 509, 513 (S.D.N.Y. 1997). However, the court is required to make a de novo determination of those portions of a report to which objection is made. 28 U.S.C. § 636(b)(1)(C).

While 28 U.S.C. § 636(b)(1) grants district courts discretion to consider additional *evidence* after a magistrate judge has issued her report, *see id.* ("The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions."), a district court generally should not entertain new grounds for relief or additional legal arguments not presented to the magistrate, *see Gonzalez v. Garvin*, 99 Civ. 11062 (SAS), 2002 U.S. Dist. LEXIS 7069, at *4–*5 (S.D.N.Y. Apr. 19, 2002) (dismissing petitioner's objection "because it offers a new legal argument that was not presented in his original petition," and adding that considering such arguments at this point would "undermine the authority of the magistrate"); *Grant v. Shalala*, No. 93-CV-0124E(F), 1995 WL 322589, at *2 (W.D.N.Y. Mar. 13, 1995) ("[V]ia his Objections, the plaintiff is arguing for the first time that he has a constitutional claim . . . Were this Court to consider the plaintiff's Objections, the Magistrate's Act would essentially be circumvented."); *see also Borden v. Sec'y of Health and Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987) ("Parties must take before the magistrate, not only their 'best shot,' but all of their shots.") (internal quotations omitted); *Like v. Crawford*, No. 4:04-CV-129 (CEJ),

2007 WL 892444, at *1 (E.D. Mo. Mar. 22, 2007) ("[T]he statutory procedure for

objecting to a report and recommendation is not the vehicle by which new claims for

habeas relief are to be presented. The Court will not review claims that were not

presented in the petition."). Of course, as petitioner is proceeding *pro se*, this Court will

"read [his] supporting papers liberally, and . . . interpret them to raise the strongest

arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994).

　　　Petitioner's objections largely reiterate the arguments made to, and rejected by,

Judge Eaton. "It is improper for an objecting party to attempt to relitigate the entire

content of the hearing before the Magistrate Judge by submitting papers to a district court

which are nothing more than a rehashing of the same arguments and positions taken in

the original papers submitted to the Magistrate Judge." *Camardo v. General Motors*

*Hourly-Rate Employees Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992)

(dismissing objections where defendant attempted to rehash its entire argument). Thus,

the Court is only obliged to review the Report for clear error. The Court finds none, but

supplements Judge Eaton's thorough Report in two respects. First, the Court finds that

petitioner failed to demonstrate that trial counsel's decision not to call two witnesses was

an unreasonable strategic decision or that the decision prejudiced him; as a result, the

performance of petitioner's trial counsel was not constitutionally deficient. Second, in an

abundance of caution, the Court reviews petitioner's claim that his petition raised four

claims which the Report did not address: (1) that the government violated its disclosure

obligations under *Brady v. Maryland*, 373 U.S. 83 (1963); (2) that the prosecutor

committed misconduct in summation; (3) that Mrs. Trinh's identification testimony

should have been excluded as the fruit of an illegal arrest; and (4) that petitioner is

actually innocent.  (Obj. at 3.)  For the reasons that follow, the Court finds that each of these claims is without merit.

## II.     Petitioner's Objections

### A.     Trial Counsel's Decision Not to Call Two Witnesses

Petitioner first argues his counsel should have had investigator Leroy Swinney testify.  Swinney interviewed Mr. Trinh before trial.  (*Id*. at 9.)  During this interview, which petitioner claims was taped, Trinh allegedly stated that his recollection of the robbery "had always been fuzzy to him."  (*Id*.)  Petitioner's trial counsel questioned Mr. Trinh about the interview with Swinney.  After establishing that Mr. Trinh had in fact spoken to Swinney, petitioner's trial counsel asked, "Mr. Trinh, do you remember telling this person . . . that you didn't have much of an impression of the robbery, that it was a long time ago, that the thing had always been fuzzy to you?"  (Tr. II at 158.)  Mr. Trinh denied making these statements, responding "No, No, I did not say that."  (*Id*.)  Petitioner also claims that his counsel should have presented the testimony of Tom Lau, who owned a store next door to the Trinhs' fruit stand.  (Obj. 10.)  Mr. Lau had told petitioner's pre-trial counsel that he saw petitioner almost every day, adding, according to petitioner, that "[h]e is a bad guy, he does drugs."  (Pet. 5D.)  Furthermore, Lau had been one of the complainants in the burglary investigation for which petitioner had been arrested on August 25.  (*Id*.)  Thus, petitioner argues that his counsel should have called to the stand someone who characterized the accused as a "bad guy" who "does drugs," and who further alleged petitioner had burglarized him to testify that because he saw petitioner every day, so did the Trinhs.  Thus, Lau's testimony not only would have had a minimal

probative effect, but it could also have been potentially damaging to the defense. Furthermore, while trial counsel did not call Lau, he did present Donna Klett's testimony that Mrs. Trinh stated that she had, in fact, seen petitioner before the robbery.

*Strickland v. Washington* sets out a two-part test to determine if counsel's assistance was constitutionally ineffective. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. 668, 687 (1984). This performance is to be judged by an objective standard of reasonableness. *Id*. at 688. Second, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. To establish prejudice, petitioner must show more than the fact that any errors merely "had some conceivable effect on the outcome of the proceeding." *Id*. at 693.

"Constitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). Indeed, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." *Strickland*, 466 U.S. at 690. Counsel's decision as to which witnesses to call or not to call is "typically a question of trial strategy that reviewing courts are ill-suited to second-guess." *Greiner*, 417 F.3d at 323 (internal quotations omitted). Thus, a decision not to call a particular witness—"even one[] that might offer exculpatory evidence—is ordinarily not viewed as

a lapse in professional representation." *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (internal quotations omitted). Of course, this nearly irrebuttable presumption of reasonable professional judgment does not apply if the decision "is not the sort of conscious, reasonably informed decision made by an attorney with an eye to benefitting his client that the federal courts have denominated 'strategic' and been especially reluctant to disturb." *Pavel v. Hollins*, 261 F.3d 210, 218 (2d Cir. 2001). In *Pavel*, a case decided under pre-AEDPA law, defense counsel chose not to present the testimony of three witnesses who could have substantially corroborated and buttressed the defendant's defense theory because counsel expected the case to be dismissed after the government's case-in-chief. *Id*. at 219–226. As counsel's decision not to call these witnesses was "animated primarily by a desire to save himself labor," *id.* at 218, the Second Circuit found that the deferential "hesitation to disturb 'strategic' decisions described above ha[d] no bearing on th[e] case." *Id.* at 219. Similarly, in *Bell v. Miller*, 500 F.3d 149 (2d Cir. 2007), the court found that the failure "to even consider consulting a medical expert regarding the reliability," *id.* at 157, of crucial identification testimony rendered counsel's performance constitutionally deficient.

In this case, there is no evidence in the record to suggest that counsel's decisions not to call Swinney and Lau were anything other than strategic choices made after thorough investigation. Swinney, a defense investigator, called Mr. Trinh in May 2000, nine months after the robbery and eight months after the Trinhs had separately identified petitioner in a lineup. Petitioner claims that Swinney would have testified that Mr. Trinh, who testified at trial with the assistance of an interpreter, told Swinney in English that his memory of the robbery was "fuzzy." Petitioner also claims that Swinney made a tape-

recording of this conversation.  At trial, defense counsel questioned Mr. Trinh about his

alleged statement on his "fuzzy" memory.  (Tr. II at 158.)  Mr. Trinh denied making the

statement, and added that he could not understand Swinney on the telephone.  (Tr. II at

157.)  Trinh also testified that he was too busy when Swinney later visited him with an

interpreter.  (*Id*.)  In this context, counsel's decision not to present Swinney's testimony

to the jury was a reasonable strategic choice.  Trinh's statement in English over the phone

to a defense investigator nine months after the robbery was unlikely to affect the jury's

assessment of the accuracy of Trinh's earlier identification of petitioner in a valid lineup.

The prosecutor could easily have rebutted Swinney's testimony by characterizing it as the

product of miscommunication or an effort to avoid speaking with a defense investigator.

Counsel could thus have sensibly concluded that testimony regarding Trinh's statement

to Swinney would only distract the jury from the defense theory that the Trinhs were

simply confused rather than deceitful.

Likewise, the potential testimony of Lau—that he operated a nearby store and

recognized petitioner from the area—could have reasonably been assessed by counsel as

having minimal evidentiary value.  In an area as heavily populated as downtown

Manhattan, the testimony of one shopkeeper that he recognized petitioner could not have

been expected to create a particularly strong inference that the Trinhs would have

recognized petitioner at the time of the robbery.  Moreover, counsel presented far

stronger evidence in support of the defense theory that Mrs. Trinh had seen petitioner

before the robbery—evidence that was apparently sufficient to convince the Appellate

Division of this fact.  *See Torres*, 8 A.D. at 123.  Counsel could have reasonably

determined that Lau's testimony would have been cumulative or repetitive.  *See Skinner*

*v. Duncan,* No. 01 Civ. 6656 (DAB) (AJP), 2003 WL 21386032, at *38 (S.D.N.Y. June 17, 2003) (Peck, M.J.) ("The failure to call cumulative or repetitive witnesses is neither ineffective nor prejudicial.").  Thus the Court concludes that counsel's decision not to call Swinney or Lau did not render his performance constitutionally deficient.

### B.    *Brady* Claim

Petitioner originally raised as his fourth grounds for relief "[w]hether petitioner was denied due process by the prosecutor's failure to disclose evidence favorable to the petitioner."  (Pet. at 6.)  The Report addressed petitioner's arguments in reference to the transcript of the 911 call, which, according to petitioner, inaccurately transcribed the tape of the call.  (Report at 28.)  As explained by Judge Eaton, the trial judge explicitly instructed the jury that the tape, and not the transcript, was the evidence.  *Id*.  In his objections, however, petitioner faults the Report for not liberally construing his fourth grounds for relief to also include a *Brady* claim.[2]  (Obj. at 3.)  Petitioner suggests the wording of his Petition's fourth grounds for relief sufficiently conveyed his *Brady* claim, and he now offers an explanation of the basis for his claim.  (Obj. at 4) (arguing prosecutor failed to disclose name of a witness).  He also asks this Court to incorporate his Brady arguments from his Second 440 Petition into his objections.  (Obj. at 14; *see* Second 440 Motion at 19–21.)  Though petitioner did not specifically raise this claim in his petition, as already noted, the Court will "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest."  *Burgos*, 14 F.3d at 790.

_____

[2] Petitioner also raises a *Rosario* claim.  (Obj. at 3); *see People v. Rosario*, 9 N.Y.2d 286 (1961) (finding trial judge's refusal to allow defense's use of prior witness statements, if prejudicial, to be reversible error).  However, "it is well settled that a *Rosario* claim is 'one of state law that is not subject to review under a petition for a federal writ of habeas corpus.'"  *Johnson v. State of New York*, No. 01 CIV. 4219 (GEL), 2002 WL 1974048, at *2 (S.D.N.Y. Aug. 26, 2002) (internal quotations omitted).

Petitioner's *Brady* objection relies on his allegations that the prosecutor failed to disclose the name of an attendant interviewed by the police at the parking lot in which the robbery took place. (Obj. at 3–4, 14.) Petitioner's *Brady* claim fails for the reasons that follow. Under *Brady* and its progeny, the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment. *See Strickler v. Greene*, 527 U.S. 263, 280 (1999); *Kyles v. Whitley*, 514 U.S. 419, 432–433 (1995). The Supreme Court has held that "[t]here are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. at 281–282. Evidence is material—and its suppression is considered prejudicial—only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 280. Here, petitioner "makes no showing that the prosecutor wrongfully suppressed any prior witness statements that were in the government's possession, let alone that any of the statements in question were materially exculpatory, or would have cast the slightest doubt on [the detective's] testimony." *Johnson v. State of New York*, No. 01 Civ. 4219 (GEL), 2002 WL 1974048, at *2 (S.D.N.Y. Aug. 26, 2002) (adding that "nothing in the record . . . remotely suggests that [the witness whose statements petitioner sought] said anything . . . that would have been useful to the defense"). Testimony at trial by the Trinhs suggested that the unnamed attendant had not actually seen anything, given his duties and location within the parking lot. (Tr. I at 374 (Mrs. Trinh testifying attendant was in booth reading newspaper); Tr. II at 111–12 (Mr. Trinh indicating

attendant never left booth).) In addition, Stephen Chang, a parking lot attendant working that night, actually disclosed the attendant's name while on the stand. (Tr. I at 344 ("His last name is Ren.").) Despite having access to the attendant's name—even if at a later stage in the proceedings—petitioner has been unable to concretely characterize what aspect of the attendant's possible testimony would in any way be favorable .

The Court notes that petitioner's second 440 Motion mentioned other bits of allegedly suppressed evidenced that were not specifically referenced in his petition or in his objections. (*See* Second 440 Motion at 19–21) (officers' memo book and notes, command log, police radio communications).) Whether or not properly raised, these additional *Brady* claims are without merit as petitioner has failed to show that this evidence was favorable or material.

### C.   Prosecutorial Misconduct Claim

Petitioner also objects to the Report's failure to liberally construe his petition to include a prosecutorial misconduct claim. (Obj. at 3.) Again, petitioner did not specifically raise this claim, nor did he include facts to support it in his petition. Only in his Objections does he allege that in addition to the prosecutor's failure to disclose evidence, her statements to the jury rise to prosecutorial misconduct. (Obj. at 16.) Despite petitioner's untimely prosecutorial misconduct claim, had he properly presented his arguments to the magistrate his claim nonetheless would fail on its merits.

Petitioner must overcome an "extremely high" burden to successfully establish a prosecutorial misconduct claim in the habeas context. *See Bentley v. Scully,* 41 F.3d 818, 824 (2d Cir. 1994) ("[I]n order to be entitled to habeas relief, [petitioner] must demonstrate that he suffered actual prejudice because the prosecutor's comments during

summation had a *substantial* and *injurious* effect or influence in determining the jury's verdict.") (emphasis added).  The acts in question must be egregious enough to amount to a denial of constitutional due process, rendering the trial "fundamentally unfair."  *Floyd v. Meachum,* 907 F.2d 347, 353 (2d Cir. 1990) (citing, *e.g.*, *Donnelly v. DeChristoforo*, 416 U.S. 637, 642–43 (1974) (requiring prosecutor's remarks to "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process").[3]  Thus, a "criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone . . . ." *United States v. Young,* 470 U.S. 1, 11 (1985) (internal quotations omitted). Furthermore, "prosecutorial misconduct during summation is grounds for reversal only when the remarks caused 'substantial prejudice' to the defendant."  *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991) (internal quotations omitted)).  A mere reasonable possibility of prejudice will not suffice.  *Id.*

Petitioner makes a variety of conclusory and nonspecific allegations in his Objections regarding the prosecutor's conduct.  (Obj. at 16.)  These allegations parallel those made on his Second 440 Motion, and given petitioner's request to incorporate arguments from his second motion into his objections, (Obj. at 14), the Court considers those arguments as well.  The Court interprets petitioner's prosecutorial misconduct claim to rely on the prosecutor's statements on summation about the reliability of the identification testimony from the Trinhs.[4]  After a defense witness testified that Mrs.

---

[3] In *Floyd*, for example, the prosecutor made both inflammatory comments as well as erroneous statements of law, characterized the non-testifying defendant as a liar over a dozen times, and asked the jury to rely on the prosecutor's own personal integrity and professional ethics when deciding whether to believe the chief prosecution witnesses.  *Id*. at 349–53.

[4] The relevant comments include various inferences and arguments regarding the Trinh's testimony.  (Tr. II at 356) ("[The Trinhs] had no motive whatsoever to lie or exaggerate . . ."); Tr. II at 361 ("[Mr. Trinh] couldn't help but tell you the absolute truth . . . [the Trinhs] are absolutely sure."); Tr. II at 381 ("There's no possible way for two witnesses to be that consistent about that many details, about everything they said

Trinh had previously acknowledged having seen petitioner before the robbery—which Mrs. Trinh vehemently denied at trial—the prosecutor told the jury, according to petitioner, that it made no sense for Mrs. Trinh to testify that she had never seen petitioner before the robbery. (See Second 440 Motion at 13.) Otherwise, she would have more easily identified him to the police and to the jury and hence have been willing to admit to her familiarity with petitioner. *Id*. The prosecutor characterized the conflicting testimony as "a mistake of one word" and assured the jury that there was no inconsistency. *Id*. Such statements did not constitute vouching or any form of improper prosecutorial advocacy, and by no means did they infect the trial to the point of "fundamental unfairness."

Petitioner also seems to equate making these statements to knowing that false evidence was being adduced at trial. (See Second 440 Motion at 16.) However, it is well established that a prosecutor may suggest reasonable inferences from testimony to the jury. *See Ramos v. New York*, No. 06 Civ. 3886(GBD) (JCF), 2007 WL 1334969, at *5 (S.D.N.Y. May 8, 2007) ("[A] prosecutor is entitled to comment upon evidence presented at trial and to urge the jury to draw reasonable inferences from that evidence.") (Francis, M.J.) (internal quotations omitted). Furthermore, there is no indication that this testimony was in any way false, or that the prosecutor thought it to be false. Petitioner's prosecutorial misconduct claim must fail

---

. . . unless they were telling the truth."); Tr. II at 684–86 (stating, with reference to Klett's testimony about Mrs. Trinh's allegedly inconsistent statement that she had seen the defendant before the robbery, that it was only "a mistake of one word," and that Mrs. Trinh had no motive to lie).)

**D.** **Identification Testimony Traceable to a Fourth Amendment Violation Claim**

Raising it for the first time in a footnote in his Objections, petitioner argues that because his prior arrest for burglary was unlawful, and because Mrs. Trinh identified petitioner in connection with this unlawful arrest, the identification evidence should be suppressed as traceable to a Fourth Amendment violation. (Obj. at 2.) (citing *United States v. Crews*, 445 U.S. 463 (1980)).[5]

Notwithstanding the generally applicable procedural bars and exhaustion, *see* 28 U.S.C. §§ 2254(b), (c), petitioner nevertheless cannot raise this claim at this juncture because it is a Fourth Amendment claim. "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976) (denying state prisoner opportunity to raise claim relating to evidence obtained by allegedly unconstitutional search or seizure on habeas petition). Despite having had every opportunity raise his Fourth Amendment claim at the trial and appellate level, as well as through his two CPL 440 motions, Petitioner only raises it for the first time here. *See Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir. 1977) (noting that petitioner had full and fair opportunity to raise claim in state court, on appeal, and through coram nobis procedure); *see also Graham v. Costello*, 299 F.3d 129, 134 (2d Cir. 2002) ("[O]nce it is established that a petitioner has had an opportunity to litigate his or

---

[5] In *Crews*, the defendant argued that a robbery victim had identified him only due to a photograph secured during an unlawful arrest, which the victim allegedly relied on later for a second, in-court identification. *Id*. at 467–68. The Court held the identification admissible, however, because the in-court identification stemmed from the victim's own, independent recollection of the robbery, and not from unlawful police conduct. *Id*. at 471–72.

her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure) . . . the claim will never present a valid basis for federal habeas relief.").[6] Thus, even if petitioner had properly raised his claim in his original petition (and regardless of whether he raised it in direct appeal or not), his Fourth Amendment claim is not cognizable in a habeas petition.[7]

### E.      Actual Innocence Claim

Petitioner also raises actual innocence as a ground for habeas relief.  (Petition at 3.)  Yet actual innocence is not itself a constitutional claim.  *Herrera v. Collins*, 506 U.S. 390, 404 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent

---

[6] Even if petitioner's claim were not barred here, to have merit, petitioner would have to establish that a) his initial arrest was unlawful, and b) Mrs. Trinh's identification has no independent source, but originated instead entirely from the unlawful arrest.  *See Crews*, 445 U.S. at 471–73 & n.18 (citing *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972) (identifying five factors used to determine independent source: opportunity of witness to view criminal during crime, witness's degree of attention, accuracy of witness's prior description of criminal, level of certainty at confrontation, and time between crime and confrontation)).  Here, Mr. and Mrs. Trinh had ample opportunity to observe the perpetrator at close range for an extended time period,  (Report at 3–5); they described the gunman as a 5'10 Hispanic man, twenty-five years old, weighing approximately 185 pounds, (Tr. II at 180:15–23), and petitioner describes himself as being of Irish and Puerto Rican descent, thirty-one years old, 6'1, and weighing 185 pounds (Pet. 6G); and both Mr. and Mrs. Trinh identified Petitioner at the line-up without hesitation less than twenty days after the robbery.  (Tr. II at 232–33.)  The evidence reflects that Mrs. Trinh's identification stemmed from a independent source and not from the allegedly unlawful arrest.

[7] The Court does not understand there to be a due process claim arising from Petitioner's arrest and subsequent identification by Mrs. Trinh.  *See, e.g.*, *Manson v. Brathwaite*, 432 U.S. 98 (1977) (recognizing due process violation when suggestive identification procedures create "a very substantial likelihood of irreparable misidentification") (citing *Simmons v. United States*, 390 U.S. 377, 395–96 (1968)).  Stretching Petitioner's factual recitation to include a due process claim, however, does not yield a different result. (*See* Pet. at 5H (describing Mrs. Trinh's witnessing Petitioner in handcuffs outside her store without mentioning due process claim).)  First, in the state proceedings, petitioner never explicitly raised a due process claim based on the danger of misidentification where the photo and line-up identifications are held soon after the relevant witness saw the accused being arrested.  *See* 28 U.S.C. § 2254(b)(1)(A) (requiring petitioner to exhaust all state judicial remedies prior to petitioning for habeas relief); *see also Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997) (same).  Second, the trial court's *Wade* hearing established that at Mrs. Trinh's photo identification, she identified petitioner's picture as :the person that robbed me," (Tr. I at 75:4–5), not as the person whom she saw being arrested.  Third, even if some evidence indicated the identification procedures were somehow suggestive, Mrs. Trinh's in-court identification was grounded in a source separate and independent from any allegedly tainted identification procedures.  *See supra*, note 6.

constitutional violation occurring in the underlying state criminal proceeding."); *see also Ortega v. Duncan*, 333 F.3d 102, 108 (2d Cir. 2003). As explained in the capital punishment context, actual innocence is "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits," *id.*; "otherwise barred" refers to claims precluded due to non-exhaustion or to successive petitions for habeas relief, for example. "[T]he 'ends of justice' require federal courts to entertain such petitions only where the prisoner supplements his constitutional claim with a colorable showing of factual innocence." *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986).[8] A petitioner wanting a precluded constitutional claim evaluated on the merits must present an "extraordinarily high and truly persuasive demonstration of actual innocence." *See Herrera*, 506 U.S. at 426 (citations omitted).

Petitioner here would presumably rely on the actual innocence exception to have his non-exhausted due process claim examined on the merits. *See supra*, note 7. Yet as already explained, his claim fails on the merits. Even if his identification process could properly be characterized as unconstitutionally suggestive, Mr. Trinh's in-court identification of Petitioner stemmed from a source independent from the allegedly unlawful arrest and suggestive identification. *See id.*

Nor does Petitioner satisfy the extraordinarily high burden demanded by the actual innocence exception. He "must show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to

_____

[8] This approach arose in the context of limiting the instances in which a federal court may review successive federal habeas petitions in a death penalty case. *Kuhlman*, 477 U.S. at 454 ("We adopt this standard now to effectuate the clear intent of Congress that successive federal habeas review should be granted only in rare cases, but that it should be available when the ends of justice so require."). Yet the Supreme Court has also applied it when a petitioner, in a first habeas petition, seeks to overcome a procedural bar, *see House v. Bell*, 547 U.S. 518, 536 (2006), and not just to a capital sentence but to any "fundamentally unjust incarceration." *Id.* (citations omitted).

any unreliability of it) . . . the trier of the facts would have entertained a reasonable doubt of his guilt.'" *Id*. at 454 n.17 (citations omitted). Merely pointing out that "he pled 'not guilty' to the crimes charged and that he continued to assert his innocence throughout the trial" is not a colorable showing of factual innocence. *See Jones v. Henderson*, 683 F. Supp. 917, 922 (E.D.N.Y. 1988). Petitioner was identified by two witnesses who had ample opportunity to observe him during the robbery, and even if Mrs. Trinh's identification, at the time of his arrest on another charge is tainted she had a sufficiently independent source on which to rely for her in-court identification of Petitioner as the August 8 gunman. Additionally, there is no indication that Mr. Trinh's identification was in any way tainted by the allegedly unlawful arrest. Allegations of actual innocence in these circumstances afford petitioner no relief.

## CONCLUSION

For the reasons stated above, the Court adopts the Report and denies the petition for a writ of habeas corpus. In addition, the Court declines to issue a certificate of appealability. The petitioner has not made a substantial showing of a denial of a federal right, and appellate review is therefore not warranted. *See Tankleff v. Senkowski*, 135 F.3d 235, 241 (2d Cir. 1998). The Court also finds pursuant to 28 U.S.C. 1915(a)(3) that any appeal from this order would not be taken in good faith. *See Coppedge v. United States*, 369 U.S. 438, 445 (1962). The Clerk of Court is directed to close this case.


SO ORDERED.

Dated: New York, New York
        June 3, 2008

Richard J. Holwell
United States District Judge

21